**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, :
et al.,                                  :
     *Plaintiffs*,                       :   No. 17-cv-5137
                           :
v.                                       :
                           :
THE COMMONWEALTH OF PENNSYLVANIA, et al., :
     *Defendants*.                       :

## DEFENDANT SENATOR JOSEPH B. SCARNATI, III'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR FEES AND COSTS

The core question for a district court in deciding whether to assess fees and costs under

28 U.S.C. § 1447(c) is simply this: Did the removing party have an "objectively reasonable basis

for removal"? *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 136 (2005). In providing this

standard, the Supreme Court made clear that a mere unsuccessful attempt at removal does *not*

result in the *presumption* of an award in favor of the plaintiff. *See id.* at 138-39. Indeed, in

reviewing Section 1447(c), the Supreme Court was persuaded that Congress did *not* intend to

permit only "obvious cases" to be removed; the Court perceived instead that Congress

understood certain non-obvious cases would be removed and yet later be deemed inappropriate

for a federal court. *See id.* at 140. The Supreme Court divined that Congress did not intend to

mete out punishment in those cases where a party, acting reasonably, attempted to extend the

law. *See id.* In other words, *Martin* sets forth what is a rather mundane proposition in both the

Third Circuit and this Court in particular; namely, a good faith or even novel legal argument,

though unsuccessful, is not the fodder for a fee award. *See Teamsters Local Union No. 430 v.

Cement Express, Inc.*, 841 F.2d 66, 70 (3d Cir. 1988) (holding "novel and unsuccessful"

argument was "not plainly unreasonable" and thus did not warrant Rule 11 sanctions); *Queen v.

Columbia Sussex Corp.*, No. 10-cv-2675, 2010 WL 3169605, at *3 (E.D. Pa. Aug. 10, 2010)

(Baylson, J.; denying fee award under Section 1447(c) where defendant unsuccessfully argued non-diverse defendant was fraudulently joined, finding "it was objectively reasonable for defense counsel to seek removal to federal court").

As is set forth fully below, Plaintiffs' Motion for Fees and Costs (doc. 24) should be denied. Defendant Senator Joseph B. Scarnati, III, while ultimately unsuccessful in his removal attempt—not because of a ruling on the merits, but because of a later-revealed procedural defect—had an objectively reasonable basis for removal. In fact, existing caselaw supported each of his arguments or, at a minimum, supported an extension of the law under the unique circumstances of this case. Further, even if the Court were inclined to grant fees, Plaintiffs' request is unreasonable, for a number of reasons, and should be denied as petitioned.

Finally, Senator Scarnati feels compelled to make an additional overarching point that applies to all of his actions in this matter. Senator Scarnati is not a defendant in this case in his capacity as a private citizen. He is named in his capacity as an elected public official and leader of the Pennsylvania Senate. In that capacity, he has a duty to the Pennsylvania public—all of it, including the Plaintiffs—to ensure the reasonable expenditure of taxpayer dollars. As the Court is well aware, the above case is but one of *three* cases challenging the 2011 congressional map. Pennsylvania taxpayers are on the hook in all three cases to pay the defense. Accordingly, if there were even a possibility to combine, coordinate, or streamline the three, Senator Scarnati had a duty to pursue it, if reasonable. That is precisely what happened here: he and his counsel fashioned good faith—reasonable—arguments under law to attempt to bring all three cases to the same court and the same judge. While Plaintiffs believe this was an act of malice or delay or obfuscation, it was not. Above all else, it was a pragmatic act, though one that ultimately failed

2

and one for which Senator Scarnati offered to reimburse Plaintiffs for the reasonably incurred travel costs. This, Senator Scarnati submits, is not the stuff of sanctions.

## I.    SUPPLEMENTAL FACTS AND PROCEDURAL HISTORY

On June 15, 2017, Plaintiffs, a group of Pennsylvania voters, filed a Petition for Review in the Commonwealth Court of Pennsylvania, challenging Pennsylvania's 2011 federal congressional map on various state law grounds. *See* Notice of Removal, Exhibit A (doc. 1-3). By application dated October 11, 2017, Plaintiffs filed an application with the Pennsylvania Supreme Court, asking it to assume plenary jurisdiction over the Commonwealth Court case. *See* Notice, Exhibit B (doc. 1-4). The Supreme Court granted that request by Order dated November 9, 2017. *See* Notice, Exhibit D (doc. 1-6). In meantime, Governor Thomas Wolf, on October 23, 2017, issued a Writ of Election, setting a special election for March 13, 2018 for the 18th Congressional District. *See* Notice, Exhibit C (doc. 1-6).

In response to the Writ of Election, Senator Joseph B. Scarnati, III, the President Pro Tempore of the Pennsylvania Senate who was named in the state court suit in his official capacity, removed the state court litigation to this Court. The Court's first electronic notice of the opening of the matter was sent via the CM/ECF system at 3:39 P.M. on November 15, 2017. After various filings, including an emergency motion to remand by Senator Scarnati himself, the Court at 2:55 P.M. on November 16, 2017 entered an order remanding the case back to state court. Thus, the case was "live" in this Court for just under 24 hours. This 24-hour case was staffed by Plaintiffs with 10 attorneys who billed in excess of 80 attorney hours, purportedly generating some nearly $50,000 in attorneys' fees and $3000 in costs. The 80 hours includes some nearly 20 hours, approximately 25% of the total hours, spent just on drafting the present Motion for Fees and Costs. For all attorneys, Plaintiffs seek over $600 per hour spent on this

3

case. Before Plaintiffs filed the Motion, Senator Scarnati offered to resolve the dispute for

$9650, chiefly to reimburse Plaintiffs' counsel for the inconvenience of traveling to an

emergency hearing that proved largely unnecessary. Plaintiffs declined the offer.

## II.    ARGUMENT

Plaintiffs are not entitled to their fees and costs under 28 U.S.C. § 1447(c) or any other

rule or law. Further, even if the Court were inclined to grant them fees and costs, the amount

requested is unreasonable.

### A.    Plaintiffs are not entitled to fees and costs under 28 U.S.C. § 1447(c) because Senator Scarnati had an objectively reasonable basis for removal.

Plaintiffs offer three grounds on which they perceive Senator Scarnati's Notice of

Removal is subject to attack as unreasonable, *see* Motion at 7-14, but upon review of the relevant

law and the facts, Plaintiffs' attacks are groundless.

#### 1.    Senator Scarnati obtained consent from all relevant defendants under Section 1446(b) and his argument that consent was not required from the remaining parties was objectively reasonable.

Senator Scarnati had an objectively reasonable basis for removing the action without

obtaining consent from the Commonwealth of Pennsylvania, Governor Tom Wolf, Lieutenant

Governor Mike Stack, Acting Secretary of the Commonwealth Robert Torres, and Commissioner

of the Bureau of Commissions, Elections, and Legislation Jonathan Marks (the "Executive

Branch Defendants"). Although Plaintiffs are correct that, generally, an action may not be

removed to federal court unless all properly joined defendants have consented, *see* 28 U.S.C.

§ 1446(b)(2), failure to obtain consent from "nominal" parties does not render removal improper.

*See Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 358 (3d Cir. 2013) (explaining that "a

federal court must disregard nominal or formal parties" in determining whether removal was

effective). Nominal defendants are those without a material interest in the litigation and "against

4

whom no real relief is sought," *Thorn v. Amalgamated Transit Union,* 305 F.3d 826, 833 (8th Cir. 2002), such that, it is "it is of no moment to them whether the one or the other side in [the] controversy succeed[s]." *S.E.C. v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991) (brackets omitted) (quoting *Bacon v. Rives*, 106 U.S. 99, 104 (1882)); *accord Bumberger v. Ins. Co. of N. Am.*, 952 F.2d 764, 767 (3d Cir. 1991) ("Nominal parties are generally those without a real interest in the litigation."). Furthermore, defendants that are joined "'only as the designated performer of a ministerial act,' or have no 'control of, impact on, or stake in the controversy[,]'" are nominal parties whose consent is unnecessary. *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 130 (D.D.C. 2013) (quoting *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 92 (2005)).

Applying these principles, it becomes apparent that Senator Scarnati had an objectively reasonable belief for believing the Executive Branch Defendants were nominal parties, whose consent to removal was unnecessary. Critically, the substantive thrust of Plaintiffs' underlying state court claims were directed at Senator Scarnati and the Legislative Defendants: they were alleged to have violated the Pennsylvania Constitution in devising the congressional districts and it was their conduct that Plaintiffs sought to control in future redistricting matters. Conversely, no significant allegations were made against the Executive Branch Defendants—either in their individual or official capacities—and to the extent any relief was requested against them, it was to compel the performance of a ministerial act.

Plaintiffs' overarching contention in the Motion for Fees and Costs in this regard is that because the Executive Branch Defendants were "indispensable," they could not be "nominal" parties.[1] Disputing, specifically, Governor Wolf's status as a nominal party, Plaintiffs quote

---

[1] Plaintiffs' allegations questioning whether Senator Scarnati obtained Speaker Turzai's consent prior to filing the Notice of Removal—or had otherwise acted improperly—are immaterial and little more than a smokescreen designed to suggest enmity between Senator Scarnati and

extensively from Senator Scarnati's filing in state court, where he argued the Governor was an indispensable party and on that basis opposed the Governor's request to be dismissed form the state court action. Relying on this purported inconsistency, Plaintiffs contend removal without the consent of the Executive Branch Defendants was objectively unreasonable.

Plaintiffs' argument, however, is unavailing, as it conflates two discrete concepts. Certainly, the ordinary dictionary definition of these words would suggest that something, or someone, that is "indispensable" cannot simultaneously be "nominal." However, Plaintiffs fail to recognize that these are terms of art, having specific meanings and implicating diverging legal principles. Whether a party is real in the removal context turns on whether it "has a vital interest," without reference to any "state pleading rules[.]" *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 92 (2005). Conversely, while a federal court's assessment of "nominal party status is a practical inquiry" that analyzes the actual interests at stake, *see Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 260 (4th Cir. 2013), Pennsylvania state courts employ a different and far more technical standard in determining whether a party is indispensable. In an action such as this, an officer of the Commonwealth is indispensable where the ultimate relief requested cannot be effectuated without that officer's action. *See, e.g., Vill. Charter Sch. v. Chester Upland Sch. Dist.*, 813 A.2d 20, 26 (Pa. Cmwlth. 2002). *Cf. Broyles v. Bayless*, 878 F.2d 1400, 1402 (11th Cir. 1989) (explaining that, in determining whether "an individual, although a party to the lawsuit, is a real and substantial party to the litigation," federal courts "do not consider the controlling state's procedural law as to who must be a party to any given action," but rather look to the substance of the complaint). Thus, whether a party is "indispensable," such

---

Speaker Turzai. Senator Scarnati obtained consent for removal from Speaker Turzai's counsel, and thus acted properly and with the reasonable belief that, because of counsel's representations, such consent had been given before removing. *See* Plaintiffs' Motion, Ex. A (doc. 24-1).

that its joinder was required in the state court action is a wholly separate inquiry from whether it is "nominal" in the context of removal.

Indeed, this is not a novel distinction. As the United States Supreme Court has expressly recognized, a party may be necessary to ensure that an action is procedurally sound, but may, nevertheless, be "nominal," such that failure to obtain its consent will not defeat removal. *See Bacon*, 106 U.S. at 104 (holding that a party was nominal despite being indispensable because their relation to the suit was "merely incidental, arising from the necessity of preserving the means whereby complainants might, if successful in this suit, obtain satisfaction of their demands against [Plaintiff].").[2] As such, with respect to Plaintiffs' principal contention, Senator Scarnati's position in federal court that the Governor was a nominal party for purposes of removal was not incongruent with his earlier position in state court that the Governor was indispensable to the state court action.

Against this backdrop, Senator Scarnati addresses each of the Executive Branch Defendants in turn, beginning with Governor Wolf. Initially, Plaintiffs are correct that Governor Wolf clearly was (and still is) an indispensable party in the state court action, since the ultimate relief that Plaintiffs seek cannot be implemented without his signature enacting the legislation. *See Vill. Charter Sch.*, 813 A.2d at 26 (holding that, because the relief requested would require the Secretary of Education to deduct certain funds from the respondent for the benefit of the petitioner, he was an indispensable party, despite the fact that the controversy, at its core, did not

---

[2] Notably, as well, this construct is consistent with the equitable principles underlying the "nominal party exception," which are intended to ensure that, on the one hand, all parties with a genuine interest agree on removal, but to prevent, on the other hand, parties with no actual interest in the outcome from impeding removal. *See Hartford Fire Ins. Co.*, 736 F.3d at 259. (observing "[t]his exception helps to prevent a party from overriding congressionally prescribed bases for removal through strategic pleading").

implicate the Secretary's interests). It does not follow, however, that Governor Wolf is a "real" party who has any "control of, impact on, or stake in the controversy." *Lincoln Prop. Co.*, 456 U.S. at 92. Here, two factors in particular evince the nominal nature of the Governor's role: (a) the unique nature of Plaintiffs' state court claim; and (b) the Governor's conduct during this action.

*First*, Plaintiffs' allegations do not implicate the Governor's traditional executive authority relative to legislation. While it may be true that, generally, the Governor's authority to sign or veto legislative enactments is more than a ministerial power, Plaintiffs' state constitutional challenge is predicated on the General Assembly's subjective intent in devising the congressional districts and it is that process that Plaintiffs argue should be judicially supervised. *Second*, the fact that the Governor has remained deliberately disengaged in the state court action confirms he is merely a nominal party. The decision in *Norman v. Cuomo*, 796 F. Supp. 654 (N.D.N.Y. 1992) is directly on point. There, an action was initiated in state court challenging New York State's legislative districts. Four of the eight named defendants participated in the removal of that case. However, the remaining four defendants, which included the Governor, Lieutenant Governor, and two members of the New York General Assembly, withheld their consent and, in fact, filed affidavits expressing their opposition to removal. A three-judge panel denied Plaintiffs' motion to remand, holding that the failure of the four non-consenting defendants to actively participate in the case rendered them "nominal" parties, whose consent was unnecessary. The *Norman* court reasoned that, "[w]hen one . . . considers that the non-consenting defendants have not taken steps that conflict with plaintiffs' position, . . . their nominal status becomes abundantly clear." *Id.* at 658. The panel further explained that:

> The nominal role of the non-consenting defendants in this suit becomes especially
> clear when contrasted to the role played by the removing defendants . . . . Unlike

> the non-consenting defendants, [the removing defendants have] formally asserted
> a legal position adverse to these plaintiffs and, through the companion suit, has
> taken affirmative steps to [block the relief sought by the plaintiffs].

*Id.* at 659.

Just like the Governor of New York in *Norman*, Governor Wolf has remained largely
disinterested in the outcome of the state court dispute and, aside from seeking to be dismissed
from the suit, has not assumed a legal position generally characteristic of a defendant whose
interest are threatened. Furthermore, similar to *Norman*, Governor Wolf's nominal role is further
underscored when compared to the role that the Legislative Defendants have played in the state
court action. In light of the foregoing, Senator Scarnati plainly had an objectively reasonable
basis for believing that Governor Wolf was a nominal party, whose consent was not necessary
for effective removal.

The nominal role of the remaining Executive Defendants is even clearer. Similar to
Governor Wolf, Lieutenant Governor Stack is not involved in evaluating or developing
congressional redistricting litigation. Although in certain unusual circumstances, the Lieutenant
Governor may be called upon to cast a tie-breaking vote in the Senate, the remote possibility of
such a minimal function does not elevate him to a "real party." *See Norman*, 796 F. Supp. at 659
(finding a party "nominal" despite the possibility that it may develop a cognizable interest in the
action in the future). Indeed, Lieutenant Governor Stack himself has previously emphasized his
limited role in the legislative process in successfully seeking to be dismissed from an action
challenging the constitutionality of legislation. *See Leach v. Commonwealth*, 118 A.3d 1271,
1277 n.4 (Pa. Cmwlth. 2015). Moreover, even if the Lieutenant Governor's potential for casting
a tie-breaking vote were somehow sufficient to find him a "real" party in an action contesting the
constitutionality of legislation, as outlined above, Plaintiffs' state court claims are highly

9

unusual, in that the constitutional infirmities that they allege relate to the subjective intent of legislators in conceiving the redistricting legislation. Lieutenant Governor Stack's role in that process is no greater than that of any ordinary Pennsylvania citizen.

Finally, turning to the Secretary Torres, and Commissioner Marks, these officers are precisely the type of "designated performer[s] of a ministerial act," with "no control of, impact on, or stake in the controversy" that courts have characterized as nominal for purposes of removal. These defendants have virtually no power in the decennial redistricting process and perform the purely ministerial task of administering and overseeing elections within the congressional districts, as formulated by the General Assembly. Furthermore neither the named officials, nor the Pennsylvania Department of State as a whole stand to suffer any institutional damage from the relief requested by the Plaintiffs.

In sum, Senator Scarnati had an objectively reasonable basis to believe he had consent to removal from all relevant parties.

### 2.    Senator Scarnati's good faith argument under the "other papers" provision of Section 1446(b)(3) was objectively reasonable.

Under 28 U.S.C. § 1446, when a state court matter is not initially removable, the matter may nevertheless later be removed within 30 days "after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order *or other paper* from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3) (emphasis added). In this matter, all parties, Senator Scarnati included, agree that the initial state court petition for review was not removable. *See* Motion at 13. However, as stated in the Notice of Removal, Senator Scarnati reasonably believed the state court matter became removable on October 23, 2017 when Governor Thomas Wolf, a defendant below and here, issued a Writ of Election under Article I, Section 2, Clause 4 of the United

10

States Constitution to fill the recently vacated 18th Congressional District seat by special election. *See* Notice at ¶ 16.[3] That Writ of Election, according to Senator Scarnati, then caused the state court matter to suddenly, and for the first time, pose a substantial federal question (explained in the following section). *See* Notice at ¶ 18.

Plaintiffs challenge that the Writ of Election could possibly be an "other paper" within the meaning of Section 1446(b)(3) because, they argue, it was "not generated within the state litigation" but rather is a non-judicial document, un-related to the case. *See* Motion at 10. Yet Plaintiffs' argument ignores Third Circuit precedent and the unique circumstances of this case. To illuminate, the Third Circuit has *already* recognized one exception to the "general" intra-judicial-paper rule described by Plaintiffs. Indeed, in *Doe v. American Red Cross*, 14 F.3d 196 (3d Cir. 1993), the Third Circuit carved out an admittedly "narrow" rule that an order from the Supreme Court in a different case to the one before a removal court can subject the case to removal under Section 1446(b)(3) where the order gives specific direction on removal. *See id.* at 201-02; *see also A.S. ex rel. Miller v. SmithKine Beecham Corp.*, 769 F.3d 204, 210 (3d Cir. 2014) (noting the Third Circuit "has recognized a narrow exception to the general rule" under Section 1446(b)(3), citing *Doe*). Here, to be clear, Senator Scarnati is not arguing the Writ of Election fits within the specific *Doe* exception.

Instead, Senator Scarnati's argument is that the Writ of Election here warranted another "narrow" exception to the Third Circuit's "general" rule. In fact, as the Third Circuit itself just recognized in *A.S.* in 2014, the exception in *Doe* was borne out of "unique circumstances," which, seemingly, gave the Circuit Court comfort that the rule would not become an exception to

---

[3] "When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies." U.S. Const. art. I, § 2, cl. 4.

swallow the whole. *See id.* at 211. In this matter, had the case not been remanded, Senator

Scarnati intended to argue, in good faith, that a narrow exception was warranted under the

equally unique circumstances here. Those circumstances are, in the main, a state-court challenge

by to federal congressional maps where in the midst of the litigation, a named-party-defendant

issues a federal writ that locks in the extant federal districts and makes them immune from state

court challenge for a period of time. *See infra.* These circumstances, Senator Scarnati believed—

then and now—warranted a good faith extension of the law under Section 1446(b)(3), especially

given that (1) the Supreme Court has not yet weighed in to foreclose such an argument (indeed,

Plaintiffs cited no such Supreme Court precedent in their Motion); and (2) the Third Circuit *has*

weighed in and *has recognized* at least one exception (i.e., it has opened the door for potential

additional exceptions). Even if Senator Scarnati's argument would not have succeeded, just

because it was not an "obvious" success does not mean it warrants sanctions. *See Martin,* 546

U.S. at 140.

      Thus, Senator Scarnati had an objective reasonable basis to seek removal under the belief

that the Writ of Election was an appropriate "other paper" under Section 1446(b)(3) that made

removal timely.

### 3. Senator Scarnati's argument that federal question jurisdiction existed was objectively reasonable.

      Senator Scarnati's theory of federal question jurisdiction, while not "obvious," *see*

*Martin,* 546 U.S. at 140, was and remains one that he nevertheless believes is fully supported by

existing federal law as applied to the unique circumstances of this case. To make that theory as

clear as possible, Senator Scarnati believed that once Governor Wolf issued the Writ of Election

on October 23, 2017, setting a special election for March 13, 2018 for the 18th Congressional

District, review of all of the districts under *state* law could not be had without answering a

threshold *federal* constitutional question, namely: Does a writ issued under Article I, Section 2, Clause 4 of the United States Constitution preclude review of a federal congressional map under state law until the special election set by the writ is completed and the congressional seat filled?

Senator Scarnati's theory of jurisdiction was objectively reasonable because the Supreme Court has long recognized that federal question jurisdiction exists in cases that do not involve federal law claims but implicate significant federal issues. *See Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 312 (2005) ("There is, however, another longstanding, if less frequently encountered, variety of federal 'arising under' jurisdiction, this Court having recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues."). In *Grable*, the Court identified the following factors that should be utilized to determine if federal jurisdiction exists:

(1)     the state law claim necessarily raises a federal issue;

(2)     the federal issue is actually disputed by the parties;

(3)     the federal issue is substantial; and

(4)     a federal forum can resolve the federal issue without disturbing or disrupting any congressionally approved balance of federal and state judicial responsibilities.

*Id.* at 314; *see also Gunn v. Minton*, 568 U.S. 251, 258 (2013). The substantiality inquiry does not focus on the importance of the issue to the parties in the case but "looks instead to the importance of the issue to the federal system as a whole." *See Gunn*, 568 U.S. at 258.

Applied here, Senator Scarnati reasonably believed as follows regarding the four *Grable* factors.

*First*, Plaintiffs' claims necessarily implicated the question under the United States Constitution identified by Senator Scarnati above. As Plaintiffs admitted in a filing to the Pennsylvania Supreme Court, they seek to resolve their case before March 6, 2018 (the due date

13

for nomination petitions for the 2018 election). *See* Notice of Removal, Exhibit B at 24 of 66.

Further, in their prayer for relief in state court, they asked that the respondents be enjoined "from

administering, preparing for, or moving forward with *any future* primary or general elections of

Pennsylvania's U.S. house members using the 2011 Plan[.]" *See* Notice of Removal, Exhibit A at

57 of 60 (emphasis added). If their case is resolved by March 6, 2018, as they requested, and the

existing districts are struck down, it will affect the special election that Governor Wolf scheduled

for March 13, 2018—a mere 7 days after the date Plaintiffs admit they want the state court case

resolved by. Thus, Plaintiffs' claims necessarily raise the federal issue of whether a federal

congressional district can be struck down where the Governor already has scheduled a special

election under his authority under the U.S. Constitution in that district. As a notable aside,

moreover, this issue is not a defense to Plaintiffs' claims, as argued by Plaintiffs, *see* Motion at

12; it is an issue that was and is embedded in Plaintiffs' current claims to strike down

Pennsylvania's congressional districts by March 6, 2018.

*Second*, the federal issue was disputed in this case. As discussed immediately above,

Plaintiffs plainly seek to impact the special election in potential contravention of the Governor's

authority under Article I, Section 2, Clause 4 of the U.S. Constitution.

*Third*, the federal issue is substantial because it is important to the federal system. The

issue involves the interpretation and effect of a provision of the U.S. Constitution that impacts

special election in all 50 states. Plaintiffs, whether they admit it or not,[4] effectively seek to stop a

special election that the Governor has exercised his power to order. Furthermore, the issue is one

---

[4] In their Motion, Plaintiffs claim they purportedly "do not seek any relief with respect to
the March 13, 2018 special election[.]" *See* Motion at 12. Yet given what they actually seek by
way of relief in their petition for review and in their application to the Pennsylvania Supreme
Court—i.e., striking down of the 2011 congressional maps before the date set for special
election—they plainly *do* seek relief with respect to the special election.

that a federal court should have decided because allowing a state court to decide it may

undermine the development of a uniform body of law interpreting the U.S. Constitution. *See*

*Gunn*, 568 U.S. at 261-62 (recognizing interest in uniform development of federal law).

  *Fourth* and finally, this Court could have resolved the federal issue without disturbing the

balance between federal and state courts. Indeed, the fact that state constitutional issues are

involved in this case would not have prevented this Court from exercising jurisdiction and

deciding the federal issue raised by Senator Scarnati as well as related state issues concerning the

validity of Pennsylvania's congressional districts.[5]

  In sum, against all of the above, Senator Scarnati reasonably believed that this Court had

federal question jurisdiction under the unremarkable application of existing precedent to the

absolutely unique circumstances of this case. This does not warrant the award of fees and costs.

  **B.**   **Plaintiffs' assertion that Senator Scarnati acted in bad faith is groundless.**

  At its core, Plaintiffs' allegation that Senator Scarnati acted in bad faith is premised on

baseless accusations that are coupled with a distorted exposition of certain carefully chosen

procedural facts. Plaintiffs maintain that Senator Scarnati "transparently [sought] to delay this

---

  [5] In their Motion, Plaintiffs attempt to argue Senator Scarnati is taking inconsistent positions in this Court and in the United States Supreme Court on which matters should proceed in which courts. *See* Motion at 13-14. To provide the context that Plaintiffs do not, Senator Scarnati asked the Supreme Court to stay the *Agre* matter, in relevant part, for the same reason he removed the state court matter to this Court: he did not want the already ongoing March 2018 special election interfered with. *See* Emergency Application for Stay Pending Disposition of Applicants' Emergency Application for a Writ of Mandamus, No. 17-631, at 23-28 (U.S. Nov. 1, 2017). Notably, as well, at the time the Writ of Mandamus was filed, the state court action was before the Commonwealth Court, which had expressly precluded the possibility of deciding the case in time for the May 2018 primary (and, thus, the March 2018 special election as well). It was not until November 9, 2017, when the Pennsylvania Supreme Court issued its order granting extraordinary relief and indicating that its decision may affect the March 2018 special election, that the federal question came to the fore. As such, contrary to Plaintiffs' representations, Senator Scarnati has, in fact consistently sought to ensure that the special election is not adversely impacted.

litigation by making contrary arguments to different courts to suit his needs." Motion at 15.

Preliminarily, reiterating their position with respect to the Governor's role in the dispute,

Plaintiffs argue that Senator Scarnati acted in bad faith because he "flip-flopp[ed] on whether the

Governor is a 'nominal' or 'indispensable' party[.]" Motion at 15. Plaintiffs also renew their

argument that Senator Scarnati's mandamus petition in *Agre v. Wolf* cannot be reconciled with

removal. Of course, as outlined above, both claims lack merit and need not be seriously

entertained. As such, Plaintiffs' claims regarding "bad faith" find no support.

### C.   Plaintiffs' accounting of attorneys' fees and costs is erroneous, excessive, and unreasonable.

Section 1447(c) of the removal statute provides for the payment of "just" attorneys' fees

and costs incurred as the result of an unsuccessful removal. *See* 28 U.S.C. § 1447(c). Plaintiffs,

applying the "lodestar method," have calculated their "just" attorneys' fees to be $49,616.50 and

their "just" costs to be $3,120.02.[6] *See* Motion at 16-18. Plaintiffs' calculations, however, are

legally and factually erroneous, excessive and unreasonable for a number of reasons, so as to

warrant a significant reduction, if not the outright denial, of the requested fees and costs.

### 1.   Plaintiffs are not entitled to any attorneys' fees for drafting this fee petition.

*First*, Plaintiffs' calculation of attorneys' fees erroneously includes "fees on fees" for

drafting their Motion. Specifically, Plaintiffs are seeking approximately $9,341.00 in attorneys'

fees for having Arnold & Porter Associate Sara Murphy spend approximately 16.3 hours (at a

rate of $445/hr.) drafting the Motion for Fees and Costs, and Partner Stanton Jones spend

---

[6] Plaintiffs advocate for the application of the "lodestar method" in calculating their attorneys' fees, yet no cite no cases from this Circuit applying the "lodestar method" to a Section 1447(c) fee application. *See* Motion at 16. Nonetheless, Senator Scarnati does not dispute the application of the underlying premise of the "lodestar method" that the calculation should be one based on reasonableness and, specifically, the number of hours *reasonably* worked multiplied by a *reasonable* hourly rate. *See id.*

approximately 2.5 hours (at a rate of $835/hr.) reviewing and revising the Motion. *See* Motion, Ex. C at 5 (doc. 24-3). Plaintiffs, however, are not entitled to "fees on fees" as a matter of law.

Nothing in the plain language of Section 1447(c) of the removal statute authorizes an award for "fees on fees." *See* 28 U.S.C. § 1447(c). Yet, in light of this lack of express statutory authority, Plaintiffs generally cite *Hernandez v. Kalinowski*, 146 F.3d 196 (3d Cir. 1998), to support an award of "fees on fees" in this case. *See* Motion at 17. *Hernandez*, however, is inapposite. In *Hernandez*, the Third Circuit was presented with the question of whether an attorney in a prisoner *civil rights* action was entitled to "fees on fees" under the Prison Litigation Reform Act (PLRA). 146 F.3d at 198. In holding that "fees on fees" were allowable under the PLRA, the Third Circuit compared the PLRA to the Civil Rights Attorney's Fees Awards Act of 1976, and explained that attorneys should be fully compensated for their work on *civil rights* claims for prisoners too. *See id.* at 200. Thus, *Hernandez* stands for nothing more than the proposition that an award of "fees on fees" may be appropriate in the context of *civil rights* cases to ensure adequate access of litigants to courts to seek redress from *civil rights* claims. *See id.* at 199-200.

Here, unlike *Hernandez*, Plaintiffs are not seeking to vindicate their *civil rights*. Nor are Plaintiffs acting as a "private attorney general" helping to "to ensure compliance with civil rights laws and benefiting the public by 'vindicating a policy that Congress considered of the highest priority.'" *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 137 (2005) (quoting *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968)). This is not a *civil rights* case, nor is it even in the nature of a *civil rights* case so as to warrant a potential award of "fees on fees." *See*

*id.* Therefore, *Hernandez* is entirely inapplicable.[7] Other than *Hernandez*, Plaintiffs offer no additional caselaw or authority for why they should be entitled to "fees on fees."

Accordingly, because Plaintiffs are not entitled to "fees on fees" as a matter of law, Plaintiffs' proposed fee calculation must be immediately reduced to $40,275.50 at the outset, before even considering the reasonableness of their fee request.

**2. The number of hours allegedly worked by ten attorneys from two firms over less than a twenty-four hour period is unreasonable.**

*Second*, the number of hours allegedly expended by *10 attorneys* to research, draft and file a 13-page motion to remand and attend a brief 15-minute hearing over, at most, a 24-hour period is excessive, redundant and unreasonable. *See* Motion at 17. Indeed, *10 attorneys*—six from Arnold & Porter and four from the Public Interest Law Center—allegedly spent 63 hours in less than one day to research, draft and file the motion to remand and then to attend a brief hearing on that motion. *See id.* That averages to almost 5 hours of attorney time being billed per page of the motion. Such hours are clearly excessive and redundant and must be excluded.

The first step in determining the reasonableness of a fee request is assessing whether the time spent was reasonable. *See Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001). In calculating the number of hours reasonably expended, a court should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described, and then exclude those that are excessive, redundant, or otherwise unnecessary. *Public Interest Research Group of N.J., Inc. v. Windall*, 51 F.3d 1179, 1185 (3d Cir.1995). It does not follow that the amount of time actually expended is the amount of time *reasonably* expended.

---

[7] Notably, if this case was a *civil rights* case, Senator Scarnati would have removed this case under Section 1443, which would have *not* required the consent of any other defendant to the action. *See* 28 U.S.C. § 1443.

*Arc of New Jersey, Inc. v. Twp. of Voorhees*, 986 F. Supp. 261, 268 (D.N.J. 1997). Indeed, hours that would not generally be billed to one's own client are not properly billed to an adversary. *Public Interest Research Group*, 51 F.3d at 1188. As such, where three attorneys are present at a hearing when one would suffice, fees should be denied for the excess time. *Arc of New Jersey*, 986 F. Supp. at 268.

Here, 6 attorneys from Arnold & Porter—3 associates, 2 partners, and 1 senior counsel— allegedly spent 38.7 hours in a 24-hour time period working on the motion to remand and preparing for a hearing on that motion. *See* Motion, Ex. C at 4-6 (doc. 24-3). On top of that, another 4 attorneys from the Public Interest Law Center—2 staff attorneys, the legal director and an of counsel—allegedly spent another 24.3 hours over that same 24-hour time period also working on the same motion to remand and also preparing for the same hearing. *See* Motion, Ex. D at 10-13 (doc. 24-4). That amounts to an astounding *10 attorneys* working 63 hours over a 24-hour period on what ultimately became a 13-page motion to remand and a brief 15-minute hearing before this Court.

Clearly, the 63 hours of work allegedly performed by these *10 attorneys* over a 24-hour period was duplicative and redundant. Indeed, it would strain credulity to argue that *10 attorneys* from two different law firms was necessary to research, draft and file a 13-page motion to remand. *See* Motion, Ex. C & D. Moreover, it would strain credulity to argue that *10 attorneys* needed to prepare for a hearing on that motion and that no less than *6 attorneys* needed to be present for the hearing on that motion to remand. *See id.* Counsel for Plaintiffs would never bill their own clients for such an excessive number of attorneys and hours over a 24-hour period, nor should such an excessive number of attorneys and hours reasonably be billed to the Pennsylvania taxpayers in this case.

Accordingly, at the very least, the 63 hours of time spent by *10 attorneys* from two law firms to work on Plaintiffs' motion to remand and prepare for a brief hearing on that motion must be reduced significantly to exclude redundant and excess time. *See Reg'l Employers' Assurance Leagues Voluntary Employees' Beneficiary Ass'n Tr. v. Castellano*, 164 F. Supp. 3d 705, 715 (E.D. Pa. 2016) (concluding that 62.4 hours for five attorneys to work on 18-page response to motion for summary judgment was excessive and should be reduced by half); *Styers v. Pennsylvania*, 621 F. Supp. 2d 239, 244 (M.D. Pa. 2008) (concluding that 71.99 hours for attorney to work on 13-page response to motion for summary judgment was excessive and should be reduced).

### 3.   Arnold & Porter's proposed hourly billing rates are unreasonable for this market.

*Third*, the hourly rates submitted by Plaintiffs for Arnold & Porter attorneys are excessive and unreasonable and do not reflect the prevailing market rates for this district. *See* Motion at 17. Indeed, the rates proposed by Arnold & Porter of Washington, DC are more than double and almost three times the prevailing rates for this district as established by Community Legal Services of Philadelphia (CLS). *See* CLS Attorney Fees, attached as Exhibit 1. Moreover, the affidavit submitted by Arnold & Porter to support these out-of-market rates is so woefully deficient that no fees should be awarded for those attorneys' work at all. *See* Motion, Ex. C. At the very least, the exorbitant rates submitted by Arnold & Porter must be significantly reduced.

The second step in determining the reasonableness of a fee request is assessing whether the attorneys' hourly rates are reasonable. *See Maldonado*, 256 F.3d at 184. A reasonable hourly rate is to be calculated according to the prevailing market rates in the relevant legal community. *Id.* In determining a reasonable hourly rate, the court should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for

20

similar services by lawyers of reasonably comparable skill, experience, and reputation. *Id.* This "forum rate rule" dictates that generally an out-of-town lawyer would not receive the hourly rate prescribed by his district but rather the hourly rate prevailing in the forum in which the litigation is lodged. *Interfaith Cmty. Org. v. Honeywell Intern., Inc.*, 426 F.3d 694, 704 (3d Cir. 2005). The prevailing party bears the burden of establishing by way of satisfactory evidence, in addition to the attorneys' own affidavits, that the requested hourly rates meet this standard. *Maldonado*, 256 F.3d at 184.

Here, the affidavit submitted by Arnold & Porter to support the requested hourly rates of its attorneys is woefully deficient and unsatisfactory in meeting the Plaintiffs' burden of reasonableness. *See* Motion, Ex. C. As noted previously, Plaintiffs have the burden of establishing that their proposed rates are reasonable. *See Maldonado*, 256 F.3d at 184. Unlike the thorough and comprehensive affidavit submitted by the Public Interest Law Center to support its proposed hourly rates, the affidavit submitted by Arnold & Porter consists of six general paragraphs and offers no detail as to the skill, experience, or reputation of *any* of the attorneys who allegedly worked on this matter. *Compare* Motion, Ex. D, *with* Motion, Ex. C.

As for the reasonableness of the attorneys' rates proposed by Arnold & Porter, the affidavit merely relies on the notion that, because these are the "standard billing rates" currently charged for the identified attorneys in Washington, DC, they must be reasonable in this market. *See* Motion, Ex. C at ¶ 3. This is clearly insufficient, however, as Arnold & Porter has the burden of showing that its rates are commensurate with the market rates in Philadelphia. *See Schofield v. Trustees of Univ. of Pennsylvania*, 919 F. Supp. 821, 830 (E.D. Pa. 1996). Accordingly, Arnold & Porter's defective affidavit should be stricken by this Court and the entirety of its fee request denied.

21

Even assuming *arguendo* that the affidavit submitted by Arnold & Porter is not so defective to warrant the complete denial of fees, the hourly rates proposed for the out-of-town Arnold & Porter attorneys are grossly excessive, unreasonable and not reflective of the rates charged in the Philadelphia market. Although the proposed hourly rates may be representative of what Arnold & Porter charges in the Washington, DC market, those rates are not representative of Philadelphia market rates. Indeed, courts of this Circuit have routinely found the fee schedule established by CLS to be a fair reflection of the prevailing market rates in Philadelphia. *See Maldonado*, 256 F.3d at 187; *Daggett v. Kimmelman*, 811 F.2d 793, 799 (3d Cir. 1987) ("there nevertheless comes a point where a lawyer's historic rate, which private clients are willing to pay, cannot be imposed on his or her adversaries"). And the CLS fee schedule is very similar and in-line with the fee schedule of the Public Interest Law Center. *Compare* Motion, Ex. D at 9, *with* CLS Attorney Fees, Exhibit 1. Not surprisingly, the CLS and Public Interest Law Center rates are approximately one-half to one-third of the hourly rates currently being proposed by Arnold & Porter. *See* Motion at 17.

In order to exemplify how excessive and unreasonable Arnold & Porter's proposed rates are, one needs to look no further than the blended hourly rate for the fees that Arnold & Porter is seeking. If you divide the total amount of fees requested by Arnold & Porter ($39,947.50) by the total number of hours allegedly worked (57.5), the blended hourly rate for Arnold & Porter to draft the motion to remand and attend a hearing regarding that motion was approximately ***$695/hr.***, regardless of the experience level of the attorney. *See* Motion at 17. According to the fee schedules for both CLS and the Public Interest Law Center, an attorney billing at that high of an hourly rate would have needed in excess of 25 years of experience. *See* Motion, Ex. D at 9;

CLS Attorney Fees, Exhibit 1. But only one of the six attorneys from Arnold & Porter billing on this case (Senior Counsel David Gersch) would even meet that criteria.

Arnold & Porter has offered no evidence that any special skill, experience or reputation warrants a higher rate than those rates established by CLS or the Public Interest Law Center, nor could they. *See Interfaith*, 426 F.3d at 705. Indeed, the motion to remand researched and drafted by the Washington, DC-based Arnold & Porter concerned discrete issues of *Pennsylvania* constitutional law, to which no out-of-state attorney could reasonably argue any special skill or expertise, particularly attorneys that had to seek *pro hac vice* admittance into this jurisdiction in the first place. Moreover, the highest number of hours (21.5) were allegedly billed by a newly-barred associate at Arnold & Porter (Associate Sara Murphy) with an alleged rate of $445/hr., which is more than double the market rate established by CLS and the Public Interest Law Center for an attorney with that level of experience.[8] *See* Motion, Ex. D at 9; CLS Attorney Fees, Exhibit 1.

Given the objective unreasonableness of the hourly rates submitted by Arnold & Porter, this Court, at a minimum, should reduce those rates to be aligned with the hourly rates submitted by the Public Interest Law Center. *See* Motion, Ex. D at 9. To that end, based on the Public Interest Law Center fee schedule, the following new hourly rates should be adopted for the following Arnold & Porter attorneys:

---

[8] Associate Sara Murphy is neither mentioned nor identified in the affidavit submitted by Arnold & Porter. *See* Motion, Ex. C. That alone is sufficient grounds to deny an award of her fees. *See Maldonado*, 256 F.3d at 184.

| Name | Years of Experience | Hourly Rate |
|---|---|---|
| Stanton Jones | 6-10 Years | $335 |
| David Gersch | Greater Than 25 Years | $650 |
| John Freedman | 21-25 Years | $530 |
| Elisabeth Theodore | 6-10 Years | $300 |
| Daniel Jacobson | 6-10 Years | $265 |
| Sara Murphy | Graduation to 2 Years | $190 |

*See* Motion, Ex. D at 9.

Applying these market rates as established by the Public Interest Law Center would result, at the very least, in a nearly 80% reduction in the total amount of fees requested by Arnold & Porter. Indeed, if the $9,341.00 in erroneous "fees on fees" is deducted from Arnold & Porter's fee calculation, Arnold & Porter would, at most, be entitled to a little more than $8,000 in total attorneys' fees, compared to the $39,947.50 in attorneys' fees that it originally requested in its fee application. *See* Motion at 17. And that, of course, is assuming no deduction in the number of hours allegedly worked, which, as detailed above, is warranted and required here.

### 4.   Computer research costs are not recoverable.

*Fourth*, Plaintiffs are not entitled to recover their requested costs for Westlaw computer research. *See* Motion at 18. Specifically, Plaintiffs seek payment for $2,185.73 in costs allegedly incurred by Arnold & Porter Associate Sara Murphy to conduct "Westlaw Computer Research." *See* Motion, Ex. C at 6. Yet, the documentation provided by Arnold & Porter does not adequately describe the research performed, nor is it even evident from the documentation that the alleged research had anything to do with preparing the motion to remand. *See id.* Absent sufficient explanation or detail, the request for computer research costs should be denied on this ground

alone. *See Borrell v. Bloomsburg Univ.*, 207 F. Supp. 3d 454 (M.D. Pa. 2016) (prevailing parties are generally entitled to recover any reasonable costs associated with litigating their claims, provided that the costs are necessary and properly documented).

Moreover, Plaintiffs do not cite a single case or authority from this Circuit, let alone one from this District, to support their claim of reimbursement for computer research costs. Indeed, the only case cited by Plaintiffs to support their request for reimbursement is a non-precedential case from the U.S. District Court for the District of Columbia, which is not binding on this Court. *See* Motion at 18 (citing *Adolph Coors Co. v. Truck Ins. Exch.*, 383 F. Supp. 2d 93, 97 (D.D.C. 2005)). But, in the *Adolph Coors* case, the District Court specifically noted that it was the practice of the attorneys involved in that case to pass along computer research costs to their clients. *See* 383 F. Supp. 2d at 97.

Here, Arnold & Porter has presented no evidence that it is typical for Arnold & Porter attorneys to pass along the costs of Westlaw computer research to their clients. Absent such evidence, it can be assumed that computer research costs are simply an item of overhead built into an attorney's fee. *See Nugget Distributors Co-op. of Am., Inc. v. Mr. Nugget, Inc.*, 145 F.R.D. 54, 59 (E.D. Pa. 1992) (holding that cost of computer assisted legal research could not be recovered by prevailing parties since cost of legal research, whether manual or computerized, was facet of attorney fee). This is particularly true, where, as here, Arnold & Porter is allegedly billing out a newly-licensed associate at a staggering rate of $445/hr. *See BD v. DeBuono*, 177 F. Supp. 2d 201, 209 (S.D.N.Y. 2001) ("Westlaw fees are simply an item of overhead, and as such should be built into the fees charged, rather than unbundled and reimbursed separately.").

Accordingly, Plaintiffs request for $2,185.73 in Westlaw computer research costs must be denied.[9]

### 5.   Joint and several liability is inapplicable.

*Fifth*, and finally, Plaintiffs' assertion that Senator Scarnati and his counsel from Kleinbard LLC should be held jointly and severally liable for any award of fees and costs is wholly without merit. *See* Motion at 20. Once again, Plaintiffs do not cite a single case or authority from this Circuit to support their bald assertion, nor do they even cite a single removal or remand case to support their argument.

Rather, the only case cited by Plaintiffs for this absurd proposition is *Baldus v. Members of Wisconsin Gov't Accountability Bd.*, 843 F. Supp. 2d 955 (E.D. Wis. 2012). *See* Motion at 20. *Baldus*, however, concerned the repeated failure of attorneys to comply with multiple orders from the District Court regarding discovery disputes. 843 F. Supp. 2d at 960. As such, the District Court imposed sanctions for the attorneys' repeated failure to obey its discovery orders pursuant to Fed.R.Civ.P. 37(b)(2)(C), which expressly provides for the payment of reasonable expenses, including attorneys' fees, from "*the disobedient party, the attorney advising that party, or both*[.]" Fed.R.Civ.P. 37(b)(2)(C) (emphasis added).

Here, unlike *Baldus*, there has been no brazen rejection or non-compliance of any orders from this Court, let alone multiple orders. More importantly, unlike Fed.R.Civ.P. 37(b)(2)(C), Section 1447(c) of the removal statute does not expressly provide for any type of joint or several liability. Indeed, Section 1447(c) merely provides that: "An order remanding the case may

---

[9] Plaintiffs also seek to recover the costs for *three* attorneys from Arnold & Porter to travel by train from Washington, DC to Philadelphia to attend the hearing on their motion to remand. *See* Motion, Ex. C at 6. Senator Scarnati does not dispute whether train travel may be reimbursable, but instead disputes how the fares for each of the three attorneys varies from $290 to $246 to $212, respectively. *See id.* Presumably, all three attorneys from the same law firm and same location traveled together and the three fares should be identical.

require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447. Nothing in the plain language of Section 1447(c) can be construed as providing for joint and several liability, and Plaintiffs have not pointed to a single case construing it that way. Accordingly, Plaintiffs' request for joint and several liability must be rejected.

### D.  Plaintiffs' remaining arguments for sanctions are procedurally and substantively defective.

Plaintiffs' recourse to Rule 11 sanctions is clearly unsustainable, even upon a cursory review of the arguments offered in support. As a preliminary matter, Plaintiffs' request is procedurally deficient since they failed to serve a Rule 11 motion on Senator Scarnati at least 21 days before filing the present Motion. *See* Fed.R.Civ.P. 11(c)(2). The purpose of this "safe harbor provision" is to provide a "twenty-one day grace period," during which time the offending party can correct its errors. *Barley v. Fox Chase Cancer Ctr.*, 54 F. Supp. 3d 396, 401 (E.D. Pa. 2014). Plaintiffs acknowledge this defect, but baldly declare that the 21-day service requirement is presently inapplicable because the procedural posture of the case made it impossible for them to comply with that directive. Plaintiffs' position, however, is belied by settled caselaw, which unmistakably provides that compliance with the safe-harbor provision is mandatory. *See, e.g., In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 99 (3d Cir. 2008) ("If the twenty-one day period is not provided, the motion *must* be denied." (emphasis added)); *accord Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012) ("The safe-harbor provision is a strict procedural requirement."); *Gordon v. Unifund CCR Partners*, 345 F.3d 1028, 1030 (8th Cir.2003) (holding that issuance of sanctions

in the absence of a party's compliance with Rule 11's procedural requirements amounted to an abuse of discretion).[10]

Insofar as Plaintiffs appear to propose an exception to this general rule, most circuits have declined similar invitations to dispense with the 21-day requirement, despite the fact that the alleged harm could not be undone and the progression of the action made compliance with the 21-day prerequisite impossible.[11] It is perhaps unsurprising, therefore, that Plaintiffs do not offer any authority for the proposition that the Rule 11(c)(2)'s safe harbor provision "does not apply here." Motion at 20 n.5. Accordingly, this Court should refuse to depart from its settled precedent to craft an exception at odds with the prevailing view among other federal circuits.

Moreover, even if this Court were inclined to overlook the essential procedural infirmity and reach the merits of Plaintiffs' Rule 11 claim, their arguments fail. As this Court has noted, Rule 11 sanctions are appropriate only upon "a showing of objectively unreasonable conduct."

---

[10] Parenthetically, while courts have occasionally excused technical noncompliance with respect to the "service" requirement of the safe harbor provision, explaining that the key inquiry is whether the offending party had adequate notice of its allegedly sanctionable conduct, courts have expressly declined to modify the 21-day *time period* in the safe harbor provision. *In re Miller*, 730 F.3d 198, 204 (3d Cir. 2013) (distinguishing case-law finding "substantial compliance" with the safe harbor provision to be sufficient, as they "involved not the period of the safe harbor but rather the form of notice—*i.e.*, a 'notification letter' sent in lieu of formal service of the . . . motion").

[11] *See Ridder v. City of Springfield*, 109 F.3d 288, 296 (6th Cir. 1997) (recognizing that, given the procedural posture of the case compliance with the safe-harbor provision may seem futile, but nevertheless, refusing to overlook that rule); *accord Steinlage v. Mayo Clinic Rochester*, 235 F.R.D. 668, 671 (D. Minn. 2006) ("The court will not impose Rule 11 sanctions when the opposing party has been deprived of its 21–day safe harbor due to the progression of the lawsuit and ultimate rejection of the allegedly offending contention."); *see also In re Walker*, 532 F.3d 1304, 1308 (11th Cir. 2008)("[T]he Second, Fourth, and Sixth Circuits have concluded that a motion under Federal Rule of Civil Procedure 11 . . . cannot be filed '[i]f the court disposes of the offending contention before the twenty-one day safe harbor period expires.'" (citing *Ridder*, 109 F.3d at 296; *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 389-90 (4th Cir.2004) (*en banc*); *In re Pennie & Edmonds LLP*, 323 F.3d 86, 89 & n.1-2 (2d Cir.2003))).

*Wolfington v. Reconstructive Orthopaedic Assocs. II, P.C.*, No. 16-cv-4935, 2017 WL 4349242,

at \*5 (E.D. Pa. Sept. 29, 2017) (citing *Fellheimer, Eichen & Braverman, P.C. v. Charter Tech.,*

*Inc.*, 57 F.3d 1215, 1225 (3d Cir. 1995)). This standard is substantially identical to the

"objectively reasonable basis" rubric that courts use in assessing a request for fees under

28 U.S.C. § 1447(c). Accordingly, for the same reasons outlined in response to Plaintiffs' claim

under Section 1447 of the removal statute, sanctions are not presently warranted.

Finally, Plaintiffs' contention that this Court should exercise its "inherent power" to

impose sanctions is similarly devoid of merit. First, "a prerequisite for the exercise of the district

court's inherent power to sanction is a finding of bad faith conduct." *Gillette Foods Inc. v.*

*Bayernwald-Fruchteverwertung, GmbH*, 977 F.2d 809, 813-14 (3d Cir. 1992) (internal citations

and quotation marks omitted). For all the reasons set forth above, particularly in Section II.B,

Plaintiffs have not—and, indeed, cannot—establish bad faith. Moreover, Plaintiffs do not offer

any reason for concluding that the present case warrants the invocation of a court's inherent

power, which "must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501

U.S. 32, 46 (1991). This relief is not available in the ordinary course and is reserved for

extraordinary circumstances. Thus, Plaintiffs' entreaties to use Rule 11 or the Court's inherent

powers must fail.

### III.   CONCLUSION

For the foregoing reasons, Senator Scarnati respectfully requests that the Court deny the

pending Motion for Fees and Costs (doc. 24).

Repsectfully submitted,

s/ Matthew H. Haverstick
Matthew H. Haverstick (No. 85072)
Mark E. Seiberling (No. 91256)
KLEINBARD LLC
One Liberty Place, 46th Floor
1650 Market Street
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140

Joshua J. Voss (No. 306853)
KLEINBARD LLC
115 State Street, 2nd Floor
Harrisburg, PA 17101
Ph: (717) 836-7492
Fax: (215) 568-0140

*Attorneys for Senator Joseph B. Scarnati, III*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Brief in Opposition to Motion for Fees and

Costs to be served on counsel via the Court's CM/ECF system.

s/ Matthew H. Haverstick
Matthew H. Haverstick (No. 85072)
KLEINBARD LLC
One Liberty Place, 46th Floor
1650 Market Street
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
*Attorney for Defendant Sen. Joseph B. Scarnati, III*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA,
et al.,
     *Plaintiffs*,

v.

THE COMMONWEALTH OF PENNSYLVANIA, et al.,
     *Defendants*.

      :
      :
      :
      :   No. 17-cv-5137
      :
      :
      :
      :

---

## ORDER

Upon consideration of Plaintiff's Motion for Fees and Costs (doc. 24), and the response thereto, it is hereby ORDERED that the Motion is DENIED.

BY THE COURT:

_____
Hon. Michael Baylson